No. 11,113.

CHARLES GIESECKE VS. FINLAY & BRUNSWIG.

The decision of the judge of the first instance upon questions of fact always prevails unless manifestly erroneous.

APPEAL from the Civil District Court for the Parish of Orleans. *Ellis, J.*

*A. B. Philips* and *Ker & Duvigneaud* for Plaintiff and Appellant.

*B. R. Forman* for Defendants and Appellees.

The opinion of the court was delivered by

NICHOLLS, C. J.   The plaintiff alleges that G. R. Finlay & Co., and Finlay & Brunswig, commercial firms in New Orleans, are indebted to him in the sum of $10,000, for real damages sustained by him through the acts and omissions of L. N. Brunswig, one of the members of said firm, acting for and on behalf of said firms.

That he was engaged under a positive and distinct verbal contract, entered into with said firms on or about the 1st of October, 1884, as the drayman of said firms, to do all its hauling of every character and description, under the express condition that each and every parcel hauled by him, either from the establishment of said firms to the various railroad depots in this city or to other points of shipment, or from said railroad depots or other points of shipment to their establishment, for account of said firms, should be paid for in accordance with the usages which obtain in the commercial community of New Orleans with respect to drayage and hauling.   That notwithstanding the specific contract, the said firm of G. R. Finlay & Co., and their immediate successors, the present firm of Finlay & Brunswig, have caused to be hauled by him freights for shipment to various points, and have received upon invoices from various points large shipments of freight upon which, under various pretences, no hauling has been charged for, or paid to him, from the said 1st of October, 1884, to the 10th of December, 1888, at which latter date, he having discovered that he had been systematically defrauded of his just dues for the services which he had rendered, through the machinations and evil practices of said Brunswig, left their service, and refused to further serve them as their drayman under said contract.

That he kept no books, and was dependent for the collection of all drayage and hauling done by him for the said firms upon the fidelity and correctness with which their books were kept, and more particularly of those books having reference to the matter of hauling and drayage.   That within a year after his employment under said contract, having been apprised that the said firm in their in-

voices to sundry consignees of goods shipped, made no charge for drayage, and having been further informed that where there were such omissions to charge drayage and hauling on goods shipped by said firm and hauled by him he would not receive the compensation provided for, as the contract called for such hauling and drayage, he complained to the said Brunswig of the fact that such omissions had been made, and protested then against the same; that said Brunswig then informed him that said omission to charge drayage and hauling upon invoices had been purposely made in order to offer inducements to the particular trade in which the firms were engaged as wholesale dealers to purchase their goods from said firm, but notwithstanding said omissions of said firm to charge upon the invoices for proper drayage and hauling done by him, he would be fully paid the entire amount of such drayage and hauling.

That notwithstanding said assurance and promise made, the said firms have not only failed to make good the promise and assurance by the payment of all drayage and hauling due him upon freight shipped, and upon which said invoices were issued and furnished, but that the said firm continued to ship goods during the period above mentioned upon which no charge for drayage and hauling have been made, and for which hauling he has never received any compensation whatever.

That the total amount of losses sustained by him through the persistent and continued omission of said firms to charge for drayage and hauling done by him, upon the invoices furnished by them to their consignees, and to pay him for such drayage and hauling, amounts to the sum of at least $10,000, which he is entitled to receive from said firms.

He prays that "they be condemned to pay him the full sum of $10,000 for real damages."

The defendants excepted to this petition:

1. For vagueness and uncertainty; that it was impossible for them to safely answer, inasmuch as the dates, number of packages or number of loads, from or to which places the hauling was done, nor the price or value of the alleged hauling done, are set forth, and

2. There was no cause of action alleged.

This exception was overruled by the court. The defendants then filed a general denial.

At the instance of the plaintiff experts were appointed to exam-

ine the books of defendants, containing account sales and invoices covering the transactions of the firms during the period in controversy, from October 1, 1884, to December 10, 1888, and report all such in which no charges for hauling or drayage had been made.

A report was made by experts under this order and submitted.

The case went to trial, a great deal of testimony was taken, and judgment finally rendered in favor of the defendants, and from this judgment the plaintiff has appealed.

In this court the defendants, in their brief, referring to their exceptions, say: "They should have been sustained. Plaintiff has mistaken his remedy. He should have sued for the amount due (if anything) for hauling, and not brought a suit sounding in damages. He should have set forth the number of loads, the place, the dates and the rate per load, and not brought a suit sounding in damages, but we do not ask that the case be remanded. We beg the court to finally dispose of it."

In the month of October, 1884, plaintiff entered the service of the defendants as a drayman. This employment continued until the 10th of December, 1888, when it came to an end on account of a disagreement having no reference to a question of indebtedness.

The plaintiff, in his testimony, states that at the commencement of his engagement he examined the books of the defendants, and from them found that the whole amount of their expenses for drayage from all quarters—goods received and goods shipped—was about $60 a week.

His present contention is that at the end of four years the defendants were indebted to him in the sum of $10,000 on account of their having omitted to charge themselves and give credit to him for drayage upon certain class of hauling done for them. Plaintiff seems to have entered upon this litigation and to have conducted it throughout with great uncertainty as to what his own claims and pretensions were. At one time he seems to have proceeded upon the theory of a concession that defendant had the right to exclude from liability for payment a certain kind of hauling, coupled, however, with the claim that this right had been *abused*, and that, as resulting from this abuse, he was entitled to *damages*; at another time, that he was entitled to payment for every kind of hauling, and that the defendants had been systematically for the whole time making out incorrect statements as to the extent of the hauling done, and

that the items omitted amounted to $10,000 more than he had received. Deeming it necessary to offer some explanation of the fact that he had so long remained in defendant's employment, he took the position that from the time he commenced until he ceased working, matters had taken the shape of a "running account," which still remained open at the time of the institution of the suit; and although he called for no account, very soon after the proceedings were instituted he called for the production of defendants' books and the appointment of experts to examine and report upon them.

In his testimony he several times denied positively that there had been any settlement between himself and his employers, and declared that he kept no books himself, and did not have access to those of the firm. The only basis upon which he grounds his idea that there was a running account between himself and Finlay & Brunswig are certain receipts in his own possession, which, varying as to dates and amounts, are identical in form. These receipts are signed by himself, and reading, "Received from Finlay & Brunswig $—— on account of drayage," are attempted to be construed as synonymous with "in account with Finlay & Brunswig for drayage."

If there were any necessity for going dehors the papers themselves for an explanation of the terms used, it would be found in plaintiff's own testimony, to which reference will hereafter be specially made, as furnishing a fair specimen of its character throughout.

The plaintiff, whilst declaring upon what he says was a positive, distinct and specific verbal contract, sometimes rests his demand upon drayage at so much per load of 1600 pounds, sometimes upon the number of articles in each load, without regard to weight, and sometimes upon the number of consignees to whom the articles were sent. Relatively to the last pretension he claims that, assuming a single load consisting of small packages for 100 consignees to be sent to one single depot for shipment, he would be entitled to 20 cents and upward for each consignee.

The defendants having waived objections to the form of the action, the matters before us for adjudication are matters simply of fact.

As far back as the case of Labat vs. Labat's Syndics, 2 N. S. 653, this court announced as being even then the well settled rule of the Supreme Court "that the decision of the judge of the first instance always prevails in questions of fact unless manifestly erroneons."

We have examined the testimony in this case with great care, and

so far from finding the judgment below " clearly erroneous," we are surprised that any expectation of its reversal should have been entertained.

As a claimant it was plaintiff's duty to have made his case at least reasonably certain. He not only has not done this, but as a witness on his own behalf he has 'satisfied us that his demand is not well founded. Not only on all important points has he been contradicted by other witnesses who have no interest in the questions involved, but he has repeatedly contradicted himself.

Being on the stand as a witness and under examination by his own counsel, we find the following questions asked with the answers thereto attached:

Q. Did they ever during the time you remained with them make any settlement with you of the amounts due to you for doing the hauling of the house?

A. No, sir.

Q. How were you paid?

A. The clerks made up the drayage, and omitted as many as they pleased. I took it for granted they were acting honestly.

Q. Did you ever give a receipt for what you got?

A. Yes, sir.

Q. How did those receipts read, do you remember?

A. I used to draw on Saturday night—for instance this Saturday night—may be $25 or $30 coming to me, or $15, and of course it would not be money enough for me to pay off, and I would draw $50 or $60, or $75.

Q. Have you any of those receipts?

A. You mean on the receipt book?

Q. Yes.

A. " Received on account of drayage."

Q. Do any of those receipts that you gave during that time show there had been any settlement between you and the firm for the hauling that had been done?

A. No, sir.

Q. Then, if I understand you, they were all receipts on account?

A. Yes, sir.

Q. And they paid you on account all the time?

A. Yes, sir.

Q. And there never was any settlement between you and the firm during the whole time you stayed there?

A. No, sir.

Q. What did these purport to be?

A. *Due bills.*

Q. Under what circumstances and in what manner were they given by you to the firm?

A. I would draw money on Saturday night and *my drayage would come to $20 or $25,* and that would not be money enough to pay my hands off, and I would ask Mr. Lastrappes, the cashier, to *advance me $75 on my following week and I would take those due bills up— simply due bills—one to pay for the other.*

Q. How did they read?

A. Here is one: " New Orleans, March 31, 1888.—Received from Finlay & Brunswig $75 on account of drayage." That is, *drawn one* week in advance. The *settlement* will show by the books what was owing by me and what they owed to me.

Q. They are all the same?

A. All the same.

Q. How many years back?

A. Well, I did not go through them. There were a great many I destroyed. *There* are some *there*—those of 1887 and 1888.

Q. Now what I want to know is, when you got your money at the end of the week—*the money coming to you for that week*—what kind of a receipt did you give them?

A. Well, suppose I had drawn $75 and they gave me credit for only $60, I would have to give another due bill for $10 or $15 to carry me over to the end of the week.

Q. I asked you what kind of a receipt did you give *when they gave you at the end of the week the drayage that was coming to you?*

A. On account of drayage.

Q. Just like that?

A. Just like that.

At a later stage of the proceedings—on cross-examination of the plaintiff—these receipts were again made the subject of examination, as will appear by the following questions and answers.

Q. They were receipts for money paid which you received?

A. They were due bills.

Q. They do not so read—"Received from Finlay & Brunswig, on

account of drayage, $25. Charles Geisecke." How do you call that receipt a due bill?

A. Because on *Saturday night* suppose one of those *due bills were outstanding against me* for $50 or $60, and I would have $10 *coming to me*, I would turn around and ask the book-keeper to *advance me* $50 or $75 for the following week.

It seems never to have occurred to the plaintiff that each time that being in arrears to the defendants for the amount of one of these so-called due bills, *he took it up—that fact of itself evidenced a settlement of accounts* by and through compensation up to the date of the withdrawal of the same.

We have entered minutely—perhaps unnecessarily so, into the testimony of this case.

It is shown by the testimony of several witnesses that the amount due to the plaintiff for each week was regularly made out and shown him at the end of the same, and as he himself states—*when the amount coming to him* at that time was insufficient to meet his present necessities, the firm would *advance* him for the next week— he giving a *due bill* for the excess which he would withdraw, when the accounts between *the two would balance.*

One of these receipts mentioned in this opinion was as late a date as March 31, 1888.

The plaintiff says in his pleadings, and in some places in his testimony, that he kept no books and relied on the statements of the defendants, but in other places he admits he kept them for a time, though declaring he gave up doing so, and the fact stands out clearly that every article received or shipped each day, passed into his own hands, and afforded him a constant opportunity for knowing precisely and accurately what he was entitled to. With this " squaring of ac-counts" taking place at the end of each week, as we have seen, he remained with the defendants for four years. His course of con-duct is inconsistent with any claim against defendants independent-ly of the positive evidence produced by the latter negativing his pretensions. For the reason herein assigned, it is hereby ordered, adjudged and decreed, that the judgment of the District Court be and the same is hereby affirmed.